UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| XUE LU, JIE HAO, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | CASE NO. 2:01-01758-CBM (Ex) <br><br> FINDINGS OF FACT AND CONCLUSIONS OF LAW |

The matter before the Court is the parties' bench trial. The Court has considered memoranda, trial briefs, witness testimony, the evidence presented, as well as the oral argument of counsel and issues the following facts and conclusions herewith.

## I. FINDINGS OF FACT

1. Plaintiffs Xue Lu ("Lu") and Jie Hao ("Hao") filed separate applications for political asylum with the Los Angeles Asylum Office of the Federal Immigration and Naturalization Service ("INS").[1] (Pre-Trial Conference Order ("PTCO") at 2:7-10.)

2. The administrative claims for Lu and Hao were received, and more than six months elapsed after the filing of the administrative claims before Plaintiffs filed their complaint. (*Id*. at 2:11-13.)

3. Thomas Powell was an employee of the Los Angeles Asylum Office of the INS when he engaged in the conduct relevant to this action. (*Id*. at 2:14-15.)

4. Powell at all times while engaging in the conduct relevant to this action was an agent, employee or representative of the United States. (*Id*. at 2:16-18.)

5. Pursuant to immigration statutes and regulations, Powell had the requisite authority provided to asylum officers to conduct interviews and grant or refer to immigration court Plaintiffs' asylum applications. (*Id*. at 2:27-3:2; 3:17-20; 8 C.F.R. § 208.14(b); *Xue Lu v. Powell*, 621 F.3d 944, 946 (9th Cir. 2010).)

6. Powell was acting within the course and scope, and under the color of, his office and employment as an officer of the Los Angeles Asylum Office of the INS. (*Id*. at 2:19-22; 4:13-17.)

7. Powell was arrested on June 8, 2000, his trial was conducted over a five-day period, the Jury rendered a guilty verdict on August 10, 2004, and he was sentenced on November 22, 2004 for violating 18 U.S.C. § 242 and 18 U.S.C. 201(B)(2)(A). (*See* Exhs. 56, 57.)

8. The Court finds the testimony of both Plaintiffs to be credible.

9. Plaintiffs Lu and Hao had the same immigration attorney, Douglas Ingraham.

---

[1] INS has been consolidated into the Department of Homeland Security ("DHS") whose component agency United States Citizenship and Immigration Services ("USCIS") adjudicates asylum applications.

### i.  Facts Pertaining to Plaintiff Xue Lu

10.  In China, prior to coming to the United States, Plaintiff Lu suffered abuse on two separate occasions at the hands of Chinese police officers due to accusations in violation of China's family planning policy. (Deposition of Xue Lu ("Lu Depo.") at 8:9-10; 9:23-11:10.) On the first occasion, she refused the officers' requests to have an abortion. After she refused, they grabbed her hair and threw her to the ground. When she was thrown to the ground, she was in extreme pain and she later suffered a miscarriage. (*Id*.) When Plaintiff Lu and her boyfriend went to a Chinese government office to request approval for marriage, the office refused and five policemen hit them, shut them in different rooms, banged Plaintiff Lu's head against the wall and kicked her legs, and released them after three hours. (*Id*. at 14:17-15:3.) Plaintiff Lu fled to the United States in 1997. (*Id*. at 13:1.)

11.  The Court finds that as of January 5, 2000, Lu was pregnant. (*See* Exh. 200; Exh. 5 at 6671.)

12.  On or about February 15, 2000, Powell interviewed Lu at an INS asylum office in the presence of her attorney for the purpose of evaluating Plaintiff Lu's asylum application. (PTCO at 2:25-2:27.)

13.  Powell telephoned Lu on February 23 and 24, 2000 and arranged to meet Lu at her residence on February 26, 2000, despite the fact that Powell knew that Lu was represented by counsel for the purpose of seeking political asylum in the United States. (*Id*. at 3:3-6.)

14.  On February 26, 2000, Powell met Lu at her residence and entered her home. (*Id*. at 3:7.)

15.  During the meeting on February 26, 2000, Powell kissed Lu's neck and ear, touched her breast and buttocks through her clothing, and attempted to unbutton her clothing. (*Id*. at 3:8-10.)

3

16. Powell did this while stating "if you want a green card, I can approve that for you." (Lu Depo. at 36:23-24.) Plaintiff rejected Powell's demands. While touching Lu, Powell said "[w]ell, I can approve you or reject you…[i]f you don't like it, I will not approve your application." (*Id*. at 39:12-13, 18-19.) She said that she did not like it, and he left Lu's home. (*Id*. at 39:19-21.)

17. Shortly after the meeting, a notification was sent to Lu that her application for asylum had been denied. (*Id*. at 3:11-12.) She was never provided another asylum interview by the Defendant.

18. Lu suffered a miscarriage after her encounter with Powell. (*See* Exhs. 5, 200.) There was testimony that stress can cause miscarriages.

19. Lu was in a particularly vulnerable state at the time of her interactions with Powell. This was due to Lu's prior experiences with Chinese officials, Powell's power over her asylum application, and Powell's larger physical size in comparison to Lu. (*See also* Exh. 56.)

20. The Court finds that Plaintiffs' expert Dr. Lustig is qualified to render an opinion on his forensic assessment of Lu.

21. Dr. Lustig stated that in his expert opinion, Lu exhibited signs of post-traumatic stress disorder ("PTSD"), citing Lu's weight loss, insomnia, avoidance of traumatic reminders and dark circles under her eyes after meetings with Powell; these experiences affected Lu's abilities to have sexual relations and that these symptoms were consistent with depression. Lu also testified that she exhibited these symptoms, for which she sought treatment.

22. Lu testified that she had trouble maintaining relationships, including engaging in sexual relations with her husband, which led to a divorce in September 2003. (Lu Depo. at 57:7-17; Exh. 20.) Lu further testified that she was remarried in June 2004, but divorced in January 2007 due to her inability to maintain a relationship. (Lu Depo. at 59:5-11, Exhs. 20, 29.) Dr. Lustig testified

1 that her trouble in maintaining relationships was due to shattered assumptions
2 about her ability to be safe in the world.
3 23. Lu testified that she felt "fearful" when she provided testimony in Powell's
4 criminal trial. (Lu Depo. at 48:22-49:8.)
5 24. Lu returned to China in approximately October 2009. (*Id*. at 62:21.) She
6 testified that Powell's conduct caused her to experience nightmares, an inability to
7 sleep, nervousness, neck pains, and not wanting to speak with others after
8 returning to China. (*Id*. at 63:25-64:6.) She also felt that due to his conduct, she
9 lost "all beautiful things…[a] happy family, a husband who loved me, a child who
10 wasn't born" and had "no meaning to life any more." (*Id*. at 65:7-13.)

### ii. Facts Pertaining to Plaintiff Jie Hao

25. In China, Plaintiff Hao was a practicing Christian when on December 25, 1998, at a Christmas eve meeting, the Chinese police broke into the meeting and searched the meeting place and slapped Hao for her involvement in Christianity. (Exh. 36 at 2.) She was interrogated for approximately five hours, her hair was pulled, was told to admit that she spread "anti-Communist Party words," was slapped several times, and forced into providing a fingerprint for a "Confession Paper." (*Id*. at 2-3.) She decided to flee China after she and her husband were no longer allowed to work at their jobs. (*Id*. at 3.) She came to the U.S. on or about September 5, 1999. (Exh. 57, at 114:12.)

26. Hao came to the United States without her husband and 7-year-old son.

27. Hao filed her asylum application on December 5, 1999. (*See* Exh. 67.)

28. On May 22, 2000, Powell interviewed Hao at an INS asylum office in the presence of her attorney for the purpose of evaluating Hao's asylum application. (PTCO at 3:15-17.)

29. Powell telephoned Hao on May 25, 2000, in an attempt to arrange a meeting regarding her application. (*Id*. at 3:21-22.)

30. Hao testified that her immigration attorney had told her what Powell had done to Plaintiff Lu, which made her fearful prior to her meeting with Powell. After her first phone conversation with Powell, Hao experienced anxiety, headaches, sleeplessness, and fear. Hao testified that she did not experience these symptoms prior to this phone conversation.

31. Powell called Hao on May 30, 2000 and arranged a meeting at her residence for June 4, 2000, despite the fact that Powell knew that Hao was represented by counsel for the purpose of seeking political asylum in the United States. (PTCO at 3:22-25.)

32. Hao's attorney contacted the U.S. Department of Justice to report Powell's conduct. Prior to June 4, Hao, her attorney, and the U.S. Department of Justice met and made arrangements to have Hao wired for sound and videotaped for the June 4 meeting with Powell. (*Id*. at 3:26-4:1.)

33. Hao met with U.S. Department of Justice Agent McCredie on June 2, 2000. Agent McCredie instructed her to signal him during the June 4 meeting if Powell engages in any improper conduct and not to allow Powell to touch her and that he would come out of the neighboring apartment and protect Hao because he would be viewing the video as it is recorded. (*See* Exh. 46.)

34. Hao consented to cooperate with the government only to record a video and phone conversations between her and Powell. (*See* Exh. 41.) At trial she testified that she did so to prevent Powell from doing something to other women and because she felt she had no choice.

35. On June 4, 2000, Hao met with Powell at her home. At the meeting, Powell told Plaintiff that he had the power to approve or disapprove her asylum application. He also told her that he would grant her asylum in exchange for $2,000. Hao testified that she felt shocked and surprised that her fate would be

1 decided by that small amount of money, and she felt fearful that she would be
2 deported back to China, thrown into prison, and persecuted by the government.
3 36. The Court received into evidence and reviewed videos documenting the
4 meetings between Powell and Hao. (*See* Exhs. 43, 53.) The video includes
5 Powell's statement that what he is doing is illegal and is not professional. (*See*
6 Exh. 43.)
7 37. At the meeting, Powell forcefully slapped Hao's buttocks multiple times in
8 a sexually aggressive manner. Hao exhibited nervousness, as evidenced by her
9 humming, pacing, and nervous laughter during the meeting. Powell kissed
10 Plaintiff's cheeks as he left the meeting. (*See* Exh. 43.)
11 38. Agents did not come to Hao's aid after Powell slapped her on the buttocks.
12 39. On June 6 and 7, 2000, Powell contacted Hao via telephone and scheduled a
13 meeting at Hao's residence on June 8, 2000. Prior to the June 8, 2000 meeting
14 between Hao and Powell, U.S. Department of Justice agents gave Hao $2,000 to
15 give to Powell and Hao was again wired for sound and videotaped during a second
16 meeting with Powell. (PTCO at 4:6-10.)
17 40. Immediately prior to the June 8 meeting, Plaintiff had trouble sleeping and
18 experienced headaches.
19 41. On the morning of June 8, 2000, Powell came to Hao's home for a second
20 meeting. Hao testified that she felt nervous and less confident that morning
21 because she was touched on the buttocks by Powell on the June 4 meeting and
22 Agent McCredie did not protect her during that meeting.
23 42. Hao gave the $2,000 to Powell and he touched Plaintiff on her knee, asked
24 for a hug, and kissed her cheeks at the June 8 meeting. (*See* Exh. 53.)
25 43. Hao testified that she understood that Powell was a decision-maker on her
26 asylum application and could remove her from the United States.
27
28

44. Powell's criminal trial did not begin until August 3, 2004. (*See* Exh. 57.) Hao's asylum application was referred to the Immigration Court on March 18, 2005, and she did not receive a Notice to Appear until February 24, 2006.

45. Hao testified that the delay in a final decision on her asylum application caused her additional emotional distress.

46. Hao testified that she experienced nervousness, headaches, and had difficulty sleeping after meetings with Powell. Dr. Lustig opined that Hao experienced anticipatory anxiety leading up to the June 4 meeting and the subsequent June 8 meeting, and anxiety during the meeting.

47. In June 2001, Hao received a work permit, moved to Arkansas, and obtained employment. She returned to Los Angeles on numerous occasions to testify as a witness in the criminal trial of Powell; the trial was continued more than once, which caused additional distress.

48. In 2005, Hao wrote to the Judge presiding over Powell's criminal trial in the Central District of California indicating that she felt alone, that her family could not come to the United States; that she has not seen her eleven-year old son for four years; and that she was feeling tortured and hurt by the constant delays in the trial. (*See* Exh. 59.)

49. She testified that while waiting for the trial, because she had not seen her son, she felt like she could not be a mother to him. She also testified that the wait to see her family, and being alone, created emotional distress.

50. Hao's asylum application was granted on August 3, 2007. (*See* Exh. 66.)

51. Hao also experienced depression regarding the delay in the adjudication of her asylum application and sought treatment in the form of acupuncture and massage to alleviate those feelings. Dr. Lustig "linked" the depression to the delay in the asylum adjudication. The Court finds that the delay in adjudicating

Hao's asylum application was originally caused by Powell's conduct and the ensuing criminal trial.

52. The Court finds that the delay in the adjudication of her asylum application aggravated Hao's stress and depression originally caused by her interactions with Powell.

## II. CONCLUSIONS OF LAW

53. The facts, insofar as they may be conclusions of law, are hereby incorporated by reference.

54. Plaintiffs have two claims, that Defendant USA (1) violated California Civil Code § 52.1 pursuant to the Federal Tort Claims Act ("FTCA"), and (2) intentional infliction emotional distress ("IIED") pursuant to the FTCA.

**A.  The Bane Act**

55. California Civil Code Section 52.1, the "Bane Act," provides relief to persons whose exercise or enjoyment of state or federal constitutional or statutory rights has been interfered with by threats, intimidation or coercion. The elements are: (1) An attempted act of interference with a [constitutional or statutory] right; (2) Accompanied by a form of coercion. *See Jones v. Kmart Corp.*, 17 Cal.4th 329, 334 (1998); *Venegas v. County of Los Angeles,* 32 Cal. 4th 820, 843 (2004). If based on speech alone, a showing must be made that the speech itself threatens violence against a specific person or group of persons. Cal. Civ. Code § 52.1(j).

56. Powell had the power to adjudicate Plaintiffs' asylum applications, and used that power to interfere with their rights to asylum and due process rights to a meaningful evidentiary hearing for asylum. *See Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334, 949 P.2d 941 (1998); *Xue Lu v. Powell*, 621 F.3d 944, 950 (9th Cir. 2010). Powell also interfered with Plaintiffs' rights secured by Article I of the California Constitution and Cal. Civil Code § 43.[2]

---

[2] Article I, section I of the California Constitution provides people the right to "enjoy[] and defend[] life and liberty, possess[], and protect[] property, and pursu[e] and obtain[] safety,

9

57. Powell's conduct interfered with Lu's and Hao's rights to asylum. (*See* Findings of Fact 15, 35-37.) Powell's conduct violated Cal. Civil Code § 52.1.

**B.     Intentional Infliction of Emotional Distress (IIED)**

58. Defendant argues that it is immune from liability under the FTCA's provisions barring certain intentional torts, including assault and battery. *See* 28 U.S.C. 2680(h). The emotional distress suffered as a result of the demand for sexual favors is an injury distinct from the battery. *Xue Lu*, 621 F.3d at 950; *Sabow v. United States*, 93 F.3d 1445, 1457 (9th Cir. 1996).

59. IIED occurred in each instance in which Powell demanded money or sexual gratification from Lu or Hao as a condition for exercising his discretion in favor of asylum. *Xue Lu*, 621 F.3d at 950.

60. Each plaintiff is required to prove the following elements to succeed on their respective IIED claims: (1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering, and (4) actual and proximate causation of the emotional distress. *See McDaniel v. Gile*, 230 Cal. App. 3d 363, 372 (1991).

61. When a defendant "(1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress," this constitutes outrageous conduct. *McDaniel v. Gile*, 230 Cal. App. 3d 363, 372, 281 Cal. Rptr. 242 (Ct. App. 1991); *see also Executive Sec. Mgmt., Inc. v. Dahl*, 830 F. Supp. 2d 870, 876 (C.D. Cal. 2011) (citing *McDaniel*).

---

happiness, and privacy." Cal. Civil Code section 43 provides that "every person has . . . the right of protection from bodily restraint of harm, for personal insult, from defamation, and from injury to his personal relations."

62. Powell abused his position as an asylum officer with power over Plaintiffs' asylum application when he demanded sexual and monetary favors, and therefore his conduct is outrageous. (*See* Findings of Fact 15, 35-37.)

63. The outrageous conduct as defined in the case law must have been done "with the intention of causing, or [acted with] reckless disregard of the probability of causing, emotional distress." *Christensen v. Superior Court*, 54 Cal. 3d 868, 903, 820 P.2d 181 (1991).

64. Powell's conduct was done with a reckless disregard of the probability of causing emotional distress. (*See* Findings of Fact 15, 17,19, 20, 22, 30, 35, 37, 40-42.)

65. "Emotional distress includes suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame. Severe emotional distress is not mild or brief; it must be so substantial or long lasting that no reasonable person in a civilized society should be expected to bear it." CACI 1604.

66. Both Plaintiffs suffered severe emotional distress. (*See* Findings of Fact 15, 17, 19, 20, 22, 30, 35, 37, 40-42, 45, 51, 52.)

67. Powell's conduct was the "actual and proximate caus[e] of the emotional distress." *Christensen*, 54 Cal. 3d at 903. This is not limited to claims of offensive touching as claimed by Defendant, but also includes the abuse of authority by Powell.

68. Powell's conduct with Lu was the actual and proximate cause of the signs of PTSD, her miscarriage, and her emotional distress. (*See* Findings of Fact 18, 19-24.) Powell's conduct with Hao was the actual and proximate cause of the nearly eight (8) year delay in the adjudication of Hao's application and the emotional distress she experienced. (*See* Findings of Fact 30, 40, 41, 45-49, 51.) The Department of Justice officer's failure to come to Hao's aid aggravated the already existing distress caused by Powell. (*See* Findings of Fact 38, 40, 41, 45.)

### C. Damages

69. Damages are awarded in FTCA actions "in accordance with the law of the place where the act or omission occurred." 28 U.S.C.A. § 1346(b)(1). In the instant action, this involves California law. *See, e.g., Ramirez v. United States*, 567 F.2d 854, 857 (9th Cir. 1977).

70. In California, this includes past and future physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress. *See* CACI 3905A. This includes recovery not only for "physical pain but [also] for fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal." *Marron v. Superior Court*, 108 Cal. App. 4th 1049, 1060, 134 Cal. Rptr. 2d 358, 366 (2003). Additionally, compensatory damages may be award absent proof of pecuniary loss such as medical bills. *See, e.g., Duarte v. Zachariah*, 22 Cal. App. 4th 1652, 1664-65 (1994).

71. "[T]he measure of damages…is the amount which will compensate for all the detriment proximately caused [by a breach of an obligation not arising from contract], whether it could have been anticipated or not." Cal. Civ. Code § 3333.

72. Lu suffered loss of enjoyment of life, grief, anxiety, humiliation, emotional distress and has signs of PTSD and physically suffered weight loss, insomnia, and "avoidance of traumatic reminders" and dark circles under her eyes. (See Findings of Fact 20.) She also suffered a miscarriage. She was in a vulnerable state when subjected to Powell's sexual advances. She endured two divorces as a result of her inability to engage in sexual relations related to the shattered assumptions she experienced as a result of Powell's conduct. She continued to experience emotional distress upon returning to China. Therefore, Plaintiff Lu is entitled to damages as follows: $500,000.

73. Hao suffered loss of enjoyment of life, grief, anxiety, nervousness, worry, humiliation, indignity and emotional distress. This was aggravated by the nearly

1  eight (8) year delay in adjudicating her asylum application.  She was in a
2  vulnerable state when subjected to Powell's demands for money and his sexually
3  aggressive behavior.  Therefore, Plaintiff Hao is entitled to damages as follows:
4  $700,000.

**IT IS SO ORDERED.**

DATED:  August 5, 2013

_____
CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE